CV-21 5679

UNITED STATES DISTRICT COURT          SEYBERT, J.
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x     LINDSAY, M.J.

DOMINIQUE PHILLIPS,

                          Plaintiff,                    WRONGFUL
                                                        DEATH
                                                        COMPLAINT
        - against -

THE LONG ISLAND RAIL ROAD COMPANY,                      Plaintiff
UNITED TRANSPORTATION UNION-LOCAL 722,                  Demands
and UNITED STATES DISTRICT COURT - E.D.N.Y.             Trial By Jury

                                                        **FILED**
                          Defendants.                   IN CLERK'S OFFICE
                                                        U.S. DISTRICT COURT E.D.N.Y.
---------------------------------------------------------------x     ☆   OCT -4 2021   ★

                                                        LONG ISLAND OFFICE

        Plaintiff, DOMINIQUE PHILLIPS, herein is appearing *"Pro Se"* for his

Wrongful Death Complaint and Jury Demand, respectfully allege as follows:


                          PARTIES


        I, DOMINIQUE PHILLIPS ("Plaintiff"), am a citizen of the United States

of the State of New York, and resides at 11 Mirin Avenue, Roosevelt, New York.

        The Defendant LONG ISLAND RAIL ROAD COMPANY ("Defendant")

upon information and belief, is a railroad corporation and is duly organized and

existing under and virtue of the laws of the State of New York, and is and at all

times a common carrier engaged in interstate commerce by railroad between

different states in the United States.

The Defendant UNITED TRANSPORTATION UNION-LOCAL 722 ("Defendant"), Labor Union, Organization, or UTU, upon information and belief is a labor union organized and existing under and by virtue of laws of the State of New York, and is and was at all times an organization unified to protect its members of representation against the employers between different states in the United States.

The Defendant UNITED STATES DISTRICT COURT of the EASTERN DISTRICT OF NEW YORK ("Defendant"), U.S. Federal Courthouse in this jurisdiction is existing under and by virtue of the laws of the State of New York.

## JURISDICTION

This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

## STATEMENTS OF FACT

1.     On February 8, 2006, the Defendant LIRR hired Plaintiff, an African American male and he is a member of a protected class.  However, prior

to Plaintiff's employment with the LIRR, he was employed with the Long Island Marriott ("Marriott") from July 1998 to December 1999. Plaintiff was advised that he could not bring up the fact that he was once employed at Marriott due to the fact that he had a pending action against them. Plaintiff testified at his deposition regarding his Marriott employment.

2.      Nonetheless, Plaintiff was hired by Defendant LIRR on February 8, 2006 as a Car Appearance Maintainer ("CAM"), located in Jamaica Station, Jamaica, New York. Plaintiff was employed to work at Defendant's LIRR Maintenance of Equipment Department ("M of E Dept."), Hillside Maintenance Facility and his immediate supervisors was and probably still is Department Head Manager Antonia Micheletti ("Micheletti"), and Assistant Manager Scott Mowbray ("Mowbray"), of Central Manpower.

3.      At the beginning of Plaintiff's employment, the Defendant LIRR provided him with written policies for reporting racial intolerance. The following policies, guidelines and rules set forth are that of "MTA LIRR Equal Employment Policy Statement", "Anti-Harassment Policy", and the "MTA Code of Ethics". Plaintiff's employment with the LIRR as a CAM, also included a

membership with the United Transportatin Union - Local 722 ("Defendant" or "UTU"), which this organization began deducting union dues and fees from his salary.

4.      Defendant's own method of evaluating employees confirms that Plaintiff was in fact a satisfactory employee.  The LIRR rated its employees using satisfactory or unsatisfactory.  On Plaintiff's four (4) evaluations, during his probationary period from February 2006 thru February 2007, he received a "satisfactory" rating.  A performance rating level described as "satisfactory", meaning that Plaintiff consistently exceeded job standards in both quantity and quality in all of the key functions of the job.  Work was consistently, accurate; errors were few and seldom repeated. Consistently dependable in accomplishing job assignments. Plaintiff handled assignments with minimum amount of supervisory direction.  Plaintiff's Gang Foreman, the evaluating manager at the time of his first two evaluations wrote that "Mr. Phillips continues to be and is a hardworking employee with strong work ethics." The other two evaluations further noted by Plaintiff's General Foreman stated "Completes work according to standard. Complete assigned work on time." As a result of these evaluations,

Defendant LIRR rewarded Plaintiff with a pay increase in salary. Therefore, Plaintiff successfully completed his mandatory one year probationary period on his anniversary (February 8, 2007); fully, adequately, and competently performed all of the necessary requirements of his job "satisfactorily".

5.      From February 8, 2006 to August 10, 2009, for about three and a half (3½ years), Plaintiff worked for Defendant's LIRR M of E Dept at four (4) different worksites from (West Side Yard, Jamaica Yard, Hillside Yard, and Hempstead Yard) free of harassment and discrimination. On August 11, 2009, Plaintiff sustained a right shoulder injury while on duty at Hempstead Yard, for which he underwent surgery on November 11, 2009, and was unable to return to regular duty as a CAM until September 2010. On December 10, 2009, Plaintiff's attorney, Emil DiNardo, Esq. of "DiNardo & Metschl, P.C." filed a lawsuit on his behalf against the LIRR through the Federal Employer's Liability Act ("FELA") for negligence, as employees of the LIRR are not eligible for worker's compensation, and FELA is the sole remedy for injury compensation.

6.      Plaintiff returned to work at Hempstead Yard on or about September 6, 2010, where Frank Angiuli ("Angiuli") was assigned as gang

foreman/supervisor. Thereafter, Plaintiff began to notice that Angiuli, who is white, for a period of two weeks, from September 13-28, 2010, was acting in a discriminatory and retaliatory hostile manner by being confrontational with him while he was trying to perform his normal duties as a mopper, and also against three (3) of his African American co-workers as well. Plaintiff reported these incidents to the UTU organization members from the union, but they failed to appear or act on Plaintiff's behalf regarding his complaints.

7.     On three (3) separate occasions (on January 19, 2011, January 24, 2011, and February 1, 2011) Plaintiff had attended three (3) funerals for family members. Lisa Whittingham ("Whittingham") was assigned to be the gang foreman/supervisor at Hempstead Yard in February 2011. During that time, Plaintiff fully performed all tasks and duties required in his position as a CAM and experienced no incidents of workplace harassment and/or discrimination. On March 28, 2011, Defendant LIRR falsey accused Plaintiff of violating its absence control policy from Janaury 1, 2011 thru February 28, 2011 when Plaintiff had attended three (3) funeral services due to family members passing, and while also being out on Family Medical Leave Act ("FMLA").

**8.**     On March 29, 2011, Plaintiff instituted a lawsuit against ALJ Ward and NYS Dept of Labor ("In Forma Pauperis") in the U.S. District Court EDNY (CV-11-1633), while Plaintiff was out on FMLA due to his wife (whom have since passed away) was out of work having surgery and the case was assigned to the two judges Defendant District Judge Joanna Seybert ("Judge Seybert") and Magistrate Judge Arlene R. Lindsay ("Judge Lindsay"), after Hon. Judge Rosylnn R. Mauskopf denied Plaintiff's former employer, Marriott's summary judgment motion (CV-04-0839), AND Plaintiff was able to thereafter settle the lawsuit.   So, it appeared to him that everything that ALJ Ward decided and stated about him was wrong and disparaging, in light of what he believe was ALJ Ward's bias against him.   Whittingham, in late April 2011, was soon after abruptly relocated without any advance notice by Defendant LIRR was being reassigned to another yard, especially when she never made a bid, or put in for a transfer to another location.   Thereafter, this started the "Domino Effect".

**9.**     On May 3, 2011, Plaintiff had subsequently filed his amended complaint and affidavit I support of his amended complaint in the U.S. District Court (EDNY) before Judge Lindsay.   Shortly thereafter, in comes, Richard

Wittenben ("Wittenben"), who is also white, was then assigned to be the gang foreman/supervisor at Hempstead Yard in May 2011.  The pattern and practice resumed and worsened with regards to hostile work environment, discrimination, harassment ("tried to bully"), disparaging treatment, defamatory character assassination, retaliatory retribution, etc. Wittenben began to deny Plaintiff equal terms, conditions, and privileges of employment.

10.    On Memorial Day of 2011, Wittenben became confrontational with Plaintiff and started a verbal altercation aboard an unoccupied train that he was cleaning during overtime that particular day.  Wittenben failed to divide the workload equally and fairly when making work assignments and falsely charged Plaintiff with unwarranted disciplinary infractions, treating Plaintiff differently than another white employee co-worker, Keith Heyward ("Heyward"), with less seniority.  Wittenben made multiple assignment changes, discriminating against Plaintiff with his white co-worker, Heyward, by now assigning him seniority-based duties even though Plaintiff had more than two (2) years seniority over Heyward.  The assignments in the yard were customarily assigned according to seniority to prevent dissension among the CAM employees.  It is Plaintiff's

understanding that seniority governs work assignments pursuant to the MTA Agreement, or why bother keeping track of seniority? Wittenben would assign Heyward to do bathrooms on the trains, though it was well established that this job is generally and required to be assigned to the senior CAM's in the yard. Plaintiff had been assigned to bathroom duties prior to Wittenben's arrival in Hempstead Yard, by his predecessor, Whittingham. Wittenben would assign Appellant 18 to 24 cars to clean in comparison to assigning Heyward 6 to 8 cars to clean.

11.   Once again, Plaintiff reported these incidents to Defendant UTU organization, but they failed to appear or take action on Appellant's behalf regarding his complaints. Also, James Snyder ("Snyder"), General Chairman of Supervisor's Union (who once was Plaintiff's gang foremen/supervisors in West Side Yard), would assign the work through seniority, which is common practice in the yards throughout the LIRR as Whittingham stated in her August 16, 2012 letter to Marilyn Kustoff ("Kustoff"). Snyder, later, provided a letter claiming seniority is only used for bids, bumps, or vacations, and is not for assigning work, which is totally untrue because seniority is also used for assigning work

to avoid favoritism leading to dissensions amongst employees, and it is pursuant to the MTA Agreement. Defendant's UTU General Chairman, Mike Denn, submitted a letter to Daniel Cleary ("Cleary") clearly contradicting Snyder's claim about seniority with regards to Appellant's craft as a CAM.

12.    On December 15, 2011, Wittenben defamed Plaintiff's character by falsely charging him with being "AWOL" and issued a written/verbal warning to him despite the fact that he was actually on LIRR property in his vehicle, and because Plaintiff refused to park his vehicle near the powerlines right next to the employee parking lot. Plaintiff considered the powerlines to be a health hazard. Wittenben had been aware of this since his arrival in Hempstead Yard that Plaintiff would park his vehicle in the commuter parking lot since 2007, which was never an issue. But, Wittenben stating at his deposition that he was unaware, which was simply not true.

13.    For a period of two weeks, from December 19-23, 2011, and December 26-30, 2011, Wittenben allowed Plaintiff to combine his two fifteen (15) minute breaks with his thirty (30) minute break (total of one hour). However, on January 10, 2012, after Plaintiff returned from his week vacation

(January 1 - 9, 2012), Wittenben decided to set up Plaintiff by falsely charging him with AWOL despite the fact that he allowed Plaintiff to combine his one hour break in the months prior to that time. Once again, Plaintiff reported these incidents to Defendant UTU organization, yet again they failed to appear or act on Plaintiff's behalf regarding his complaints.

14.     Thereafter, on January 20, 2012, Road Car Inspector ("RCI"), Michael Pairan ("Pairan"), tipped off Wittenben telling him that Plaintiff asked him to write a letter on his behalf regarding the ongoing workplace harassment. As a result of RCI Pairan's betrayal, Plaintiff was soon after persecuted and targeted for bullying and ridicule. The persistent bullying and mistreatment by Wittenben did cause Plaintiff work related stress, anxiety, chest pains, etc., and on February 16, 2012, the MTA Police and the Nassau County EMS were called by Wittenben as a result of Plaintiff's chest pains, etc. Thereafter, Plaintiff was cleared by paramedics, and he drove himself to the Nassau University Medical Center (emergency room), where he was then hospitalized and kept for observation. Once again, Plaintiff reported this incident to Defendant UTU, and they failed to appear on Plaintiff's behalf, or to have Wittenben reprimanded or removed from the yard with regards to the incidents.

- 11 -

15.    Following the February 16, 2012 incident, Wittenben failed to complete the requisite "Employee Accident/Incident Report Form" (AR-1), "Accident/Incident Investigation Form" (AR-20), and/or "Accident/Incident Findings Form" (AR-21), which is required by the Defendant for work related illness or accidents on the job.  As a result, of no accident/illness report being completed or filed, Plaintiff was not compensated for the time lost from work due to stress induced symptomatology brought on by the pressure by Wittenben's hostile and discriminatory behavior in the workplace, which he covered up by failing to report it.

16.    Defendant UTU refused to file a grievance on Plaintiff's behalf in regards to the ongoing bullying and harassment by Wittenben.  On March 16, 2012, Plaintiff contacted his former attorney, Emil DiNardo, Esq. ("DiNardo") to see if he could file a grievance on his behalf, and was advised that UTU is in place to handle grievances, and DiNardo said he also represented UTU in the past which would be a "conflict of interest."  DiNardo advised Plaintiff to contact his union rep, Micheal Denn ("Denn"), who is white, and demand that Denn file a grievance at once, and if he did not file it, Plaintiff was advised to

report the UTU to the National Labor Relations Board ("NLRB").  Make no mistake about it, the only reason UTU filed a grievance on Plaintiff's behalf was the threat of being reported to the NLRB.

17.  Both Cleary and Kustoff (who are both white) from the M of E Dept & Trial Office, rendered a "biased" decision on March 26, 2012, Kustoff covered up the incident while "posing" as Cleary when they conspired to deny Plaintiff's disability accident (D/A) status by breaching the MTA Agreement. Plaintiff's co-worker, Jessie Ward, provided his sworn witness statement on his behalf, despite Wittenben's attempt to cover it up, and although Defendant UTU failed to appeal LIRR's tainted decision, Plaintiff appealed that decision on April 2, 2012 on his own.

18.  Defendant UTU failed to appeal Cleary and Kustoff's March 26, 2012 letter of deniel that was biased, which would have implicated the both of them of conspiracy and/or obstruction of justice, etc.  Due to the fact that UTU failed to appeal LIRR's tainted decision, the LIRR then exploited it by targeting Plaintiff with trumped up disciplinary infractions (malicious campaign of harassment, etc.), which was done as a pretext because of his complaints of the race discrimination, etc.

19.    Defendant's LIRR Central Manpower Department Head Manager (Micheletti), LIRR Medical Department Head Manager, Micheal Nersesian ("Nersesian"), and UTU Representative (Denn), who are all white, were given copies of Plaintiff's doctor statements on numerous occasions of Wittenben's discrimination, harassment, and bullying, still they allowed Plaintiff to be subjected to the hostile work environment. There is also evidence that Nersesian himself could have changed disability status from D/S to D/A as he once did back in February of 2011, which Appellant would have never been in violations of Defendant's absence control policies. From April 17, 2012 thru May 2, 2012, Plaintiff was then subsequently harassed by Mowbray of Central Manpower, who is white, with his repeated issuance of unwarranted AWOL disciplinary charges that is defamatory, and thereafter, Kustoff's harassment ensued with regards to her rescheduling notices. Defendant's LIRR Medical Dept had Plaintiff out of work D/S from April 16-30, 2012. Therefore, Plaintiff should not have ever been issued any disciplinary charges regarding his absences.

20.    Wittenben on several occasions began stalking and tailgating Plaintiff's car after the end of his work shift from May 2012 thru September

- 14 -

2012. Plaintiff's treating physician, Dr. Edmund C. Neuhaus, PhD. ("Dr. Neuhaus"), on June 28 & 29, 2012 provided his diagnosis of Plaintiff's ailments regarding the discrimination, harassment, etc., while Kustoff for a second time conspired again by posing as Cleary on July 3, 2012. In September 2012, Wittenben then referred to Plaintiff as a "rat" in front of his co-workers because I reported the discrimination and workplace harassment. Meanwhile, Wittenben is trying to defect attention from himself when he's the one who was referred to as a rat by LIRR employees, due to the fact he's a C.I. for Kustoff in the M of E Dept.

21.     On September 26, 2012 and October 1, 2012, Plaintiff's treating physician, Dr. Neuhaus, and his former attorney, Timothy Kilgannon, Esq. ("Kilgannon"), provided Kustoff and the other LIRR officials, and UTU with letters in regards to Plaintiff's salary being withheld, and LIRR's failure to follow "proper protocol" under the MTA Agreement. Defendant's former LIRR President Helena E. Williams ("Helena E. Williams") and her subordinates were all in receipt of Plaintiff's notice of complaint, and in retaliation, Wittenben had him put "out of service" on October 2, 2012 with a trumped up charge regarding

his baseless and defamatory "drug & alcohol" claim.  When that unfounded claim turned out to be "negative", the Defendant then fabricated by making up a second claim of "insubordination" to cover up the claim drug & alcohol in order to keep Plaintiff from returning back to his job at the LIRR.

22.     Shortly thereafter, on October 26, 2012 and December 3, 2012, Plaintiff was wrongfully terminated from employment, and he notified his union on several occasions and asked to be put back to work.  Plaintiff believes he was discharged for reporting abusive and discriminating behavior against him by his supervisor, Wittenben.  Plaintiff's work I.D. photo was thereafter smeared throughout the Defendant LIRR by James Stevenson and the M of E Dept. Defendant's former LIRR President (Helena E. Williams), LIRR's Medical Dept.,  M of E Dept, and the Defendant UTU were all provided with Plaintiff's correspondences, doctor's statements, etc. and/or complaints of abusive discriminatory and retaliatory harassing behavior by Wittenben, and no one took any form of disciplinary action against him.  Also, Defendant's UTU had firsthand knowledge of LIRR's misdeed and failed to protect Plaintiff as a member due to the fact of a direct "conflict of interest" with both Denn and Anthony Crispino, as LIRR Employees as well as UTU Representatives.

- 16 -

**23.** Moreover, during that time in 2012, when Plaintiff was brought up on those trumped up disciplinary charges for which he was not guilty of, he was advised by the Defendant's UTU, his union reps to hire an attorney to assist him in defending himself at the Defendant's internal hearings since the union was not adequately representing him or fighting on his behalf. That's when Plintiff hired Kilgannon, who at the time attempted to contact Fyffe ("Defendant's EEOC diversity management office"). Fyffe failed to responded to Kilgannon, or work with Kilgannon to get to the bottom of the unfounded charges brought against Plaintiff. This matter would most likely have been resolved by the EEOC office at Defendant's EEOC diversity management office. Since Fyffe refused to entertain any communication from Plaintiff's lawyer, Kilgannon, and because Kilgannon was not allowed to be present at any of the hearings for the wrongful charges Plaintiff had to defend against, he was found guilty of those trumped up charges, and thereafter dismissed from his job with Defendant.

**24.** It is Plaintiff's contention that had the Defendant's EEOC office, Fyffe, done what he was supposed to do in regards to communicating with Plintiff's lawyer, Kilgannon, this would not have escalated to the point where

Plaintiff would have to file his complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), and thereafter initiate a lawsuit against the Defendants LIRR & UTU. After his wrongful termination, Plaintiff was caused to suffer severe, personal, painful & emotional injuries, mental anguish, embarrassment, humiliation, disability, denial of social pleasure and enjoyments, change of lifestyle and has been and will continue to suffer additional damages.

## PROCEDURAL HISTORY

**25.**    On August 21, 2013 and September 20, 2013, Plaintiff filed a charge of racial discrimination against Defendants LIRR & UTU with the EEOC, as well as other claims. On September 23, 2013, the EEOC notified Plaintiff by letter of his 90-day right to sue Defendants LIRR & UTU. On December 23, 2013, Plaintiff appeared at the Defendant U.S. Federal Courthouse in the Eastern District of New York ("EDNY") to file his lawsuit against Defendants LIRR & UTU. Defendant Deputy Court Clerk, Thomas Talbot ("Talbott"), stated that Plaintiff looked familiar, and ask him *"have you been here before?"* Plaintiff responded *"yes, I had a case back in 2011"*.

- 18 -

Talbott searched the computer and his findings revealed there was a prior case in which Plaintiff had been assigned to both Defendants, Judge Seybert and Judge Lindsay.   Yet, despite Plaintiff's protestation, due to the "conflict of interest", at which point Plaintiff asked him if he could be reassigned two other judges? Talbott refused, he assigned Plaintiff the same two judges (Defendants Seybert & Lindsay).   Plaintiff had no choice but to file his complaint *"Pro Se"* against Defendants LIRR & UTU in the (EDNY), because that was the last day for him to file his lawsuit within the 90-day statue.

**26.**   On March 30, 2015, Plaintiff filed an amended complaint against Defendants LIRR & UTU, and several individuals.   However, Defendant Judge Lindsay incorrectly stated that Plaintiff did not seek leave to amend when he actually submitted two letters seeking leave.   Defendant LIRR certainly believed the amended complaint was proper because they answered it.   On October 16, 2015, Plaintiff's attorney filed a third amended complaint.

## ABUSE OF DISCRETION

**27.**   The District Court erred in finding that Appellee's termination of Appellant was not discrimination based on his race and gender discrimination, hostile work environment, retaliation, etc.

- 19 -

**28.**    "Abuse of discretion is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing Court unless it has a definite and firm conviction that the Court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." <u>Lowry v. Long Island Rail Road</u>, 370 F.2d 911 (1966).

**29.**    On February 3, 2015, April 20, 2015, and December 28, 2015, Judge Lindsay (at least on three or more separate occasions) referred to Plaintiff in her response by letter to him as <u>"she"</u> and <u>"her"</u>, despite she knows him to be male.

**30.**    During the two (2) settlement conferences before Judge Lindsay on April 6, 2017 and August 15, 2017, Plaintiff late wife, Antares Wendler-Phillips, was present showing spousal support, hoping the case would finally settle. The Defendant LIRR attempted to use the arbitrator's decision to mislead the Court, especially since Plaintiff testified at his deposition that the facts of Plaintiff's D/S to D/A status was never made known to the Arbitrator, which Kustoff and Cleary colluded to deny Plaintiff his D/A status, etc.

- 20 -

31.     During the pendency of summary judgment, the District Court had known Plaintiff was without counsel at this most crucial time of the litigation. Plaintiff timely filed a request for an extension of time.  The District Court of course had the discretion to not grant the time requested, but the District Court instead granted Plaintiff absolutely zero time to respond to an Order that Magistrate Judge Lindsay herself took ten (10) months to write.  That decision was completely disparities and was the impetus of Plaintiff's case dismissal. For not allowing Plaintiff even a 90, 60, or 30 days extension to at least put something together in his defense was an abuse of discretion.  Plaintiff's own treating physician, Suzanne Anderson, on January 3, 2020, had also pointed out that Plaintiff did fall into a deep depression compounded by not being allow any time for an extension to file his objections to the summary judgment.

## PAIN & SUFFERING FOR MONETARY DAMAGES

32.     My wife late, Antares Wendler-Phillips, past away (wrongful death) on **October 4, 2019** as a result of the pain and suffering we (Plaintiff's family) had to endure as a result of Defendant's willful harassment, race and gender

- 21 -

discrimination, defamation of character, violations of due process, retaliation, unlawful suspension, wrongful termination, compensatory damages, emotional distress damages, embarassment and humiliation, legal fees & expenses, and overwhelming financial hardship due to financial burden & undue stress which ultimately causing or contributing to Plaintiff's beloved wife's death **$ Million is undetermined at this time**, and Plaintiff wish to hire an attorney at a some point in time, and/or reserve the right to revise-amended his wrongful death complaint, etc.

**33.**  An award of attorney's fees, cost, and prejudgment interest necessitated by this action together with such other further relief as this Court deems just and proper

Date: October 4, 2021
Roosevelt, New York

Respectfully submitted,

Dominique Phillips, Pro Se
(Wrongful Death Complaint)
11 Mirin Ave, P.O. Box 161
Roosevelt, New York 11575