UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMINIQUE PHILLIPS,<br>as Personal Representative of the<br>Estate of Antares Wendler-Phillips<br><br>                     Plaintiff,<br>   v.<br><br>METROPOLITAN<br>TRANSPORTATION AUTHORITY,<br>THE LONG ISLAND RAIL ROAD, and<br>SMART, as the successor in interest to<br>the UNITED TRANSPORTATION<br>UNION-LOCAL 722,<br><br>                     Defendants. | Case No.: 21-cv-05679<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

     This is a wrongful death action brought by Plaintiff, DOMINIQUE PHILLIPS, a personal representative of the Estate of Antares Wendler-Phillips, by his attorney Jonathan Rosenberg, complaining against the defendants, METROPOLITAN TRANSPORTATION AUTHORITY ("MTA"), THE LONG ISLAND RAIL ROAD ("LIRR"), and SMART, as the successor in interest to the United Transportation Union-Local 722 ("TWU"), upon information and belief, respectfully alleges as follows:

### WRONGFUL DEATH

     On September 27, 2019, a typical Saturday dinner for the plaintiff and his daughter, was abruptly disrupted when his wife, Antares Wendler-Phillips, unexpectedly collapsed in the kitchen. She was experiencing what appeared to be a seizure, her eyes rolling back in her head. The plaintiff quickly dialed 911, even as

his minor daughter stood by, paralyzed by shock. Despite the emergency services' swift arrival and immediate action, the hospital delivered grim news: cardiac arrest with potential brain damage; she remained on life support. By October 4, his wife had passed away.

This is a wrongful death complaint against the defendants arising from their relentless pattern of discrimination, defamation, harassment, and retaliation against Dominique Phillips during his employment with the LIRR, and which in turn led to his unlawful termination from that position, thus depriving his wife and daughter of a basic livelihood. The extreme stress inflicted upon the plaintiff as a direct result of defendants' actions ultimately caused his wife, Antares Wendler-Phillips, to suffer, based on information and belief, a fatal, stress-induced heart attack in front of the plaintiff and their young daughter.

## PARTIES

Plaintiff Dominique Phillips is an individual residing at 11 Mirin Avenue, Roosevelt, New York, within the Eastern District of New York.

Defendant Long Island Rail Road ("LIRR") is a subsidiary of the Metropolitan Transportation Authority ("MTA"), a public benefit corporation providing commuter rail service in the State of New York and engaged in interstate commerce by rail, operating a system of railroads and railroad yards within the jurisdiction of this court and in various states.

Defendant SMART, the successor in interest to the Transportation Workers Union-Local 722 ("TWU"), is a labor organization, formed and existing under the laws of the District of Columbia.

## JURISDICTION

This Court has subject matter jurisdiction over the claim against LIRR pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including but not limited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between SMART and TWU, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

The Plaintiff, an African American male, was hired by the defendant, Long Island Rail Road (LIRR), on February 8, 2006, making him a member of a protected class. His role at LIRR was a Car Appearance Maintainer (CAM) at the Jamaica Station in Jamaica, New York. He was assigned to LIRR's Maintenance of Equipment Department at the Hillside Maintenance Facility, supervised by Department Head Manager Antonia Micheletti and Assistant Manager Scott Mowbray of Central Manpower.

Upon beginning his employment, the Plaintiff was given written policies from the defendant, LIRR, on reporting racial intolerance. These policies include the "MTA LIRR Equal Employment Policy Statement", "Anti-Harassment Policy", and the "MTA Code of Ethics". His job as a Car Appearance Maintainer (CAM) involved membership in the United Transportation Union - Local 722 (UTU), which started deducting union dues and fees from his salary. The defendant's evaluation system, which rates employees as either satisfactory or unsatisfactory, confirmed that the Plaintiff was indeed a satisfactory employee. During his probationary period from February 2006 to February 2007, he received "satisfactory" ratings on all four evaluations. A "satisfactory" rating signifies that an employee consistently exceeds job standards in terms of both quantity and quality across all key job functions, with minimal errors and dependable job completion.

The Plaintiff completed assignments with minimal supervisory direction. His Gang Foreman lauded him as a hardworking employee with strong work ethics in his first two evaluations, while his General Foreman remarked on his timely work completion in the subsequent two. As a result, the defendant, LIRR, rewarded the Plaintiff with a salary increase. He successfully finished his mandatory one-year probationary period on February 8, 2007, meeting all job requirements satisfactorily. From February 8, 2006, to August 10, 2009, the Plaintiff worked at four different LIRR Maintenance of Equipment Department worksites without experiencing harassment or discrimination. However, on August 11, 2009, he sustained a right shoulder injury at the Hempstead Yard, requiring surgery in

November 2009 and preventing his return to regular duties until September 2010. His attorney, Emil DiNardo, Esq., filed a lawsuit on his behalf against LIRR under the Federal Employer's Liability Act (FELA) for negligence on December 10, 2009, as LIRR employees are not eligible for workers' compensation. Upon his return to work at Hempstead Yard around September 6, 2010, he was supervised by Frank Angiuli.

After his return to work, the Plaintiff noticed that his supervisor, Angiuli, exhibited discriminatory and confrontational behavior towards him and three African American colleagues between September 13 and 28, 2010. Despite reporting these incidents to his union, United Transportation Union, no action was taken. Angiuli was removed from Hempstead after he received discrimination complaints from female workers.

In January and February 2011, the Plaintiff attended three funerals for family members. Lisa Whittingham took over as supervisor at the Hempstead Yard in February 2011, during which time the Plaintiff performed his duties without experiencing any workplace harassment or discrimination. However, on March 28, 2011, the defendant, LIRR, wrongfully accused the Plaintiff of violating its absence control policy from January to February 2011, despite his attendance at funerals and his taking leave under the Family Medical Leave Act (FMLA).

On March 29, 2011, while on family leave due to his wife's sudden death, the Plaintiff filed a lawsuit against ALJ Ward and the NYS Department of Labor in the U.S. District Court EDNY (CV-11-1633). The case was assigned to Judge Joanna

Seybert and Magistrate Judge Arlene R. Lindsay. After a summary judgment motion against his previous employer, Marriott, was denied, the Plaintiff managed to settle the lawsuit, undermining the credibility of ALJ Ward's previous adverse decisions about him. In late April 2011, his supervisor, Lisa Whittingham, was unexpectedly relocated by the defendant, LIRR, marking the start of a so-called "Domino Effect". On May 3, 2011, the Plaintiff filed his amended complaint and supporting affidavit in U.S. District Court (EDNY) before Judge Lindsay. Richard Wittenben, who is white, was then appointed as the new supervisor at Hempstead Yard in May 2011. This change brought back and amplified the issues of a hostile work environment, discrimination, harassment, defamatory treatment, retaliation, and unequal terms and conditions of employment.

On Memorial Day 2011, supervisor Richard Wittenben engaged in a verbal altercation with the Plaintiff aboard a train during overtime work. Wittenben distributed work unequally, unjustifiably disciplined the Plaintiff, and treated him differently than a less senior white colleague, Keith Heyward. Despite the Plaintiff's two years of seniority over Heyward, Wittenben reassigned seniority-based duties from the Plaintiff to Heyward, violating established practices under the MTA Agreement. These duties included cleaning train bathrooms, a task typically assigned to more senior employees. Prior to Wittenben's tenure, this responsibility had been assigned to the Plaintiff by the previous supervisor, Lisa Whittingham. Wittenben also assigned the Plaintiff 18 to 24 cars to clean, compared to 6 to 8 cars

for Heyward. The Plaintiff reported these issues to the United Transportation Union, but they did not respond or intervene on his behalf.

James Snyder, General Chairman of the Supervisor's Union and former gang foreman to the Plaintiff, traditionally assigned work based on seniority, a common practice throughout the LIRR, as acknowledged by Lisa Whittingham in her 2012 letter to Marilyn Kustoff. Snyder later contradicted this, stating in a letter that seniority was only for bids, bumps, or vacations, and not work assignments. This claim was refuted by the United Transportation Union General Chairman, Mike Denn, in a letter to Daniel Cleary, emphasizing that seniority is also used for work assignments to prevent favoritism and discord among employees, in line with the MTA Agreement. On December 15, 2011, Richard Wittenben falsely accused the Plaintiff of being "AWOL" and issued a warning despite the Plaintiff being on LIRR property in his vehicle. The Plaintiff had chosen not to park near powerlines adjacent to the employee lot due to health concerns, a practice that Wittenben had been aware of since his arrival at Hempstead Yard and had not been problematic previously.

Wittenben claimed in his deposition to be unaware of the Plaintiff's parking issue, which was untrue. From December 19-23, 2011, and December 26-30, 2011, Wittenben allowed the Plaintiff to combine his two 15-minute breaks with his 30-minute break, totaling one hour. However, on January 10, 2012, following the Plaintiff's week-long vacation, Wittenben falsely accused the Plaintiff of being AWOL for taking the combined hour-long break, a practice he had previously

permitted. Despite reporting these incidents to the United Transportation Union, no action was taken on the Plaintiff's behalf. On January 20, 2012, Road Car Inspector Michael Pairan informed Wittenben that the Plaintiff had requested a letter supporting his claims of workplace harassment, leading to intensified bullying and ridicule of the Plaintiff. As a result of this ongoing harassment by Wittenben, the Plaintiff experienced work-related stress, anxiety, and chest pains. On February 16, 2012, Wittenben called the MTA Police and Nassau County EMS due to the Plaintiff's chest pains.

After experiencing chest pains, the Plaintiff was cleared by paramedics and drove himself to the Nassau University Medical Center for further observation. Despite reporting this incident to the United Transportation Union, no action was taken to reprimand or remove Wittenben from his supervisory position. Wittenben failed to fill out the necessary forms regarding work-related illness or accidents, as per the company's policy. This lack of official documentation resulted in the Plaintiff not receiving compensation for work missed due to stress-related symptoms induced by Wittenben's workplace harassment, which Wittenben subsequently failed to report. The Union refused to file a grievance for the Plaintiff regarding Wittenben's ongoing harassment. On March 16, 2012, the Plaintiff sought legal advice from his previous attorney, Emil DiNardo, but was told that it would be a conflict of interest since DiNardo had previously represented the Union and that the Union should handle the grievances.

DiNardo suggested the Plaintiff to demand his union representative, Micheal Denn, to immediately file a grievance. If Denn refused, DiNardo recommended the Plaintiff report the Union to the National Labor Relations Board (NLRB). It's significant to note that the Union only filed a grievance on behalf of the Plaintiff due to the threat of being reported to the NLRB. However, two white individuals, Daniel Cleary and Marilyn Kustoff from the M of E Dept & Trial Office, issued a biased decision on March 26, 2012, denying Plaintiff's disability accident (D/A) status, in violation of the MTA Agreement. Despite a corroborating witness statement from Plaintiff's co-worker Jessie Ward, and Wittenben's attempts to cover up the incident, the Union did not appeal the LIRR's tainted decision. The Plaintiff appealed the decision on his own on April 2, 2012. The Union's failure to challenge the biased decision by Cleary and Kustoff may be seen as conspiratorial or obstructive. LIRR subsequently leveraged this situation by targeting the Plaintiff with false disciplinary charges. This campaign of harassment appears to be a pretext to his complaints of racial discrimination.

The heads of LIRR Central Manpower Department (Micheletti), LIRR Medical Department (Michael Nersesian), and Union Representative (Denn), all of whom are white, received multiple copies of doctor's reports detailing Wittenben's discriminatory and harassing behavior towards the Plaintiff, yet they failed to intervene, subjecting the Plaintiff to a continued hostile work environment. Evidence suggests that Nersesian could have adjusted the Plaintiff's disability status to prevent violations of LIRR's absence control policies, as he did in February

2011. From April 17 through May 2, 2012, the Plaintiff experienced further harassment from Mowbray of Central Manpower, who unjustly charged him with AWOL, tarnishing his reputation. Thereafter, Kustoff perpetuated the harassment through rescheduling notices. As LIRR's Medical Department had the Plaintiff marked as "out of work" from April 16-30, 2012, there was no valid reason for disciplinary charges related to absence. Wittenben escalated the situation by stalking and tailgating the Plaintiff from May through September 2012. When a hearing was scheduled regarding plaintiff's complaints, Kustoff only permitted management to testify.

On June 28 and 29, 2012, the Plaintiff's doctor, Dr. Neuhaus, documented the Plaintiff's health conditions related to the discrimination and harassment. Despite this, Kustoff continued to conspire by impersonating Cleary on July 3, 2012. In September 2012, Wittenben disparagingly referred to the Plaintiff as a "rat" in front of his co-workers for reporting the workplace harassment and discrimination.

Wittenben, ironically referred to as a "rat" by LIRR employees due to his alleged role as a Confidential Informant (C.I.) for Kustoff in the M of E Department, tried to deflect attention from himself. On September 26 and October 1, 2012, the Plaintiff's physician, Dr. Neuhaus, and his former lawyer, Timothy Kilgannon, sent letters to Kustoff, other LIRR officials, and the UTU. These letters addressed the withholding of the Plaintiff's salary and LIRR's failure to adhere to the proper protocol under the MTA Agreement. Despite numerous notifications and requests to the Union to be compensated for D/A disability status by the plaintiff's late wife, her

pleas were ignored. In or around August and September of 2012, on at least two occasions, both Phillips and his late wife appeared in person at the Union office in Babylon, New York, to speak to Denn about his salary and other issues regarding his job; his wife became visibly upset and emotional because she was frustrated that the Union was working against her husband, all while taking his fees and rightful earnings, and causing stress in the household.

Helena E. Williams, the former LIRR President, and her subordinates received notice of the Plaintiff's complaints. In response, Wittenben retaliated by placing the Plaintiff "out of service" on October 2, 2012, on the grounds of an unfounded and defamatory "drug & alcohol" claim. When this accusation proved to be baseless with a "negative" result, the Defendant fabricated an "insubordination" charge to prevent the Plaintiff's return to work at the LIRR. Consequently, the Plaintiff was wrongfully terminated from his job on October 26 and December 3, 2012. Despite multiple notifications and requests to his union to be reinstated by Dr. Neuhaus and Phillips, his pleas were ignored. They took away the plaintiff's livelihood – his benefits – his means of supporting his family – and all through a reactive, vindictive and retaliatory culture that ignored the rules and procedures meant to protect workers and their families.

The Plaintiff alleges that his termination resulted from reporting his supervisor, Wittenben's, abusive and discriminatory behavior. Following his dismissal, his work I.D. photo was purportedly spread across the LIRR by James Stevenson and the M of E Department. Various departments of the LIRR, including

the former President (Helena E. Williams), Medical Department, M of E Department, and the UTU, were all provided with correspondences, doctor's statements, and complaints related to Wittenben's alleged discriminatory and retaliatory behavior. However, no disciplinary action was taken against Wittenben. The UTU, despite being aware of the LIRR's misconduct, failed to protect the Plaintiff due to a direct "conflict of interest" with Denn and Anthony Crispino, who served as both LIRR employees and UTU representatives.

In 2012, when the Plaintiff faced unjust disciplinary charges, he was advised by the UTU, his union reps, to hire a lawyer for his defense during the LIRR's internal hearings, as he believed that the union was not sufficiently advocating for him. The Union was incompetent as a matter of purpose. Consequently, the Plaintiff hired attorney Kilgannon, who then attempted to contact Fyffe, a representative from the Defendant's EEOC diversity management office. LIRR counsel denied Phillips a right to a hearing by misinforming his attorney, Kilgannon, that he had Union representation – that the Union would speak on his behalf at the hearing. Of course, the Union failed to come to Phillips's defense. In fact, Philips's prior attorney was informed that he need not appear on the plaintiff's behalf by LIRR counsel because he would have representation by the Union present; Philipps ended up having no representative, and the hearing ultimately did not occur as to his workplace complaints due to an adjournment to no time or date.

On December 23, 2013, the Plaintiff filed his lawsuit against Defendants LIRR & UTU at the U.S. Federal Courthouse in the Eastern District of New York

("EDNY"). On March 30, 2015, he submitted an amended complaint against the Defendants, including several individuals.

During two settlement conferences before Judge Lindsay on April 6, 2017, and August 15, 2017, the Plaintiff's late wife, Antares Wendler-Phillips, was present to offer spousal support in the hope of a resolution. However, the Plaintiff argues that Defendant LIRR attempted to mislead the court using the arbitrator's decision. He claims this was especially misleading because the arbitrator was not informed of the Plaintiff's transition from DIS to DI A status, a fact which he testified to at his deposition. The Plaintiff accuses Kustoff and Cleary of colluding to deny him his DI A status.

This matter, having been timely commenced, was remitted by the Second Circuit Court of Appeals to to the Eastern District Court for further proceedings.

This action is timely commenced based on information and belief, and pursuant to 28 U.S.C. 2401 and 2675(a).

The Plaintiff's wife, Antares Wendler-Phillips, passed away on October 4, 2019. The Plaintiff attributes her death to the distress caused by the Defendant's alleged misconduct, which includes willful harassment, discrimination, defamation of character, due process violations, retaliation, unlawful suspension, wrongful termination, emotional distress, embarrassment and humiliation, and financial hardship. The total compensation sought for these damages and his wife's wrongful death is currently undetermined. In sum, this domino effect of bad faith, insidious conduct by the Union and Railroad was completely preventable, and the stress

suffered by the Phillips family, as documented most closely by his wife's medical practitioner, took a foreseeable toll on her livelihood, and life.

## AS AND FOR A FIRST CAUSE OF ACTION

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

The plaintiff's wife suffered a wrongful death under EPTL § 5-4.1, which is appropriately brought pursuant to federal law.

The defendants, LIRR and TWU, owed a duty of care to Phillips to provide a workplace free from discrimination, harassment, and retaliation.

The defendants breached their duty of care by engaging in a pattern of discrimination, defamation, harassment, and retaliation against Phillips.

The defendants' breach of their duty of care proximately caused Antares Wendler-Phillips to suffer a fatal, stress-induced heart attack, resulting in her wrongful death.

As a direct and proximate result of the defendants' conduct, Phillips and his daughter have suffered and continue to suffer from severe emotional distress, pain, and suffering, as well as the loss of support, companionship, and guidance of Antares Wendler-Phillips.

The plaintiff seeks damages for emotional distress, compensatory damages, and punitive damages.

The plaintiff alleges, based on information and belief, that at least 30 days has elapsed since the demand upon which plaintiff's action was founded was

presented to a member of the authority or other officer so designated for purposes of any neglect.

The plaintiff seeks attorney's fees, costs, and pre-judgment interest due to this action, along with any other relief deemed appropriate by the Court.

The plaintiff reserves the right to amend this complaint.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff requests that the Court grant all allowable damages, including compensatory, emotional, and punitive, as well as reasonable costs and attorneys' fees under 42 U.S.C. §§ 1988 and 12205, or other applicable law, pre- and post-judgment interest to the fullest extent permitted by law; and any additional relief the Court deems just and proper.

ROSENBERG LAW FIRM

_____,
Jonathan Rosenberg, Esq.
137 Court Street, Fl. 2
Brooklyn, New York 11201
(718) 715-4845
office@rosenbergpllc.com

Dated:   Brooklyn, New York
         June 26, 2023